United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOME BUILDERS ASSOCIATION OF NORTHERN CALIFORNIA, CALIFORNIA BUILDING INDUSTRY ASSOCIATION, BUILDING INDUSTRY LEGAL DEFENSE FOUNDATION,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, H. DALE HALL, UNITED STATES DEPARTMENT OF THE INTERIOR, LYNN SCARLET,<br><br>    Defendants.<br><br>CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Defendant-Intervenor. | No. C 07-00572 WHA<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

This action has been brought by plaintiffs Home Builders Association of Northern California, California Building Industry Association, and Building Industry Legal Defense Foundation against defendants United States Fish and Wildlife Service, H. Dale Hall, United States Department of the Interior, Lynn Scarlet, and defendant-intervenor Center for Biological Diversity to overturn the "threatened" status of the Central California population of the California tiger salamander under the Endangered Species Act, 16 U.S.C. 1531, *et seq*.

1  For the reasons stated below, plaintiffs' motion for summary judgment is **DENIED** and
2  defendants' cross-motion for summary judgment is **GRANTED**.

## STATEMENT

The Endangered Species Act is intended "to provide a means whereby the ecosystems upon which endangered species and threatened species may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. 1531(b). In determining whether a species should be listed as threatened or endangered, the process may begin either on the initiative of the United States Fish and Wildlife Service ("FWS") or by petition from any interested person. 16 U.S.C. 1533(b)(3), (5–6). If FWS receives a petition, the Secretary must determine to the maximum extent practicable whether the petition contains "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. 1533(b)(3)(A). FWS then has one year to determine whether the species warrants listing. 16 U.S.C. 1533(b)(3)(B). The listing decision must take into account efforts being made by any state or subdivision thereof to protect the species, and must be made "solely on the basis of the best scientific and commercial data available to [the Secretary] after conducting a review of the status of the species." 16 U.S.C. 1533(b)(1)(A). The decision may take into account any of the following factors: (1) the present or threatened destruction, modification, or curtailment of habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting continued existence. 16 U.S.C. 1533(a)(1).

The California tiger salamander (*ambystoma californiense*) is a large, stocky salamander with small eyes and a broad, rounded snout (69 Fed. Reg. 47212, 47214). The salamander is black with white or pale yellow spots or bars on its back and sides, and with a white or pale yellow underside. Its habitat includes vernal pools as well as natural and artificial ponds in grassland and oak savannah areas in California. Though once considered a subspecies of the tiger salamander, recent studies have shown the California tiger salamander to be a unique species distinct from other tiger salamanders (*ibid*).

The species is found throughout California, and it includes (but is not limited to) distinct population segments ("DPS") in Central California, Sonoma, and Santa Barbara (69 Fed. Reg. 47,214). On June 11, 2001, the Center for Biological Diversity ("CBD") submitted a petition to list the Sonoma County population as an endangered DPS of the California tiger salamander. FWS had previously made permanent the endangered listing status of the Santa Barbara County DPS (65 Fed. Reg. 57,242). FWS did not list the Sonoma DPS as endangered, and CBD subsequently filed suit to compel listing of the Sonoma DPS as endangered. *Ctr. for Biological Diversity v. United States Fish and Wildlife Serv.*, C-02-00055 WHA (N.D. Cal. 2002). The parties settled, and on March 19, 2003, FWS permanently listed the Sonoma DPS as endangered (68 Fed. Reg. 13,498). At this point, both the Sonoma and Santa Barbara DPSs were listed as endangered. On May 23, 2003, FWS proposed listing the Central California population as threatened (*id.* at 28,648).

FWS published a final rule listing the California tiger salamander as "threatened" over its *entire* range on August 4, 2004, undoing the earlier listings of "endangered" for the Sonoma and Santa Barbara DPSs (69 Fed. Reg. 47,212). Defendant-intervenor CBD then filed suit, challenging the downgrading of the DPSs in *Ctr. for Biological Diversity v. United States Fish and Wildlife Service*. 2005 WL 2000928 (N.D. Cal. 2005) (Alsup, J.). On August 19, 2005, this Court decided in favor of CBD on summary judgment, and overturned the reclassification of the DPSs as threatened, thereby restoring those listings to endangered, *i.e.,* the prior "endangered" listing of the Santa Barbara and Sonoma DPSs were reinstated. The Central California DPS's listing as threatened, however, was left in place. *Id*. at *16–17. Therefore, while the Sonoma and Santa Barbara DPSs were listed as endangered, Central California tiger salamanders were still deemed "threatened."

In May 2006, plaintiffs Home Builders Association of Northern California, California Building Industry Association, and Building Industry Legal Defense Foundation ("Home Builders") filed the instant action, challenging FWS's designation of the Central California DPS as threatened, in the United States District Court for the District of Columbia. CBD requested, and was granted, intervenor status and moved to change venue to

3

1  the Northern District of California. That motion was granted on March 1, 2007, and the action
2  eventually arrived here. The following table summarizes the changes in classification for the
3  three DPSs:

**Classification of Distinct Population Segments Over Time**

| Distinct Population Segment ("DPS") | Classification by March 2003 | Classification by August 2004 | Classification by August 2005 |
|---|---|---|---|
| Sonoma DPS | Endangered | Threatened | Endangered |
| Santa Barbara DPS | Endangered | Threatened | Endangered |
| Central California DPS | N/A | Threatened | Threatened **[CURRENTLY DISPUTED]** |

11  The parties now make cross-motions for summary judgment. Plaintiffs claim that the
12  listing of the *Central California salamander* as "threatened" is illegal on the following
13  four grounds: (1) plaintiffs allege that FWS did not articulate a standard for ascertaining the
14  salamander's threatened status; (2) plaintiffs claim that FWS failed to follow the mandate of
15  16 U.S.C. 1533(b)(1)(A) to use the best available scientific or commercial data because FWS
16  disregarded the LSA study; (3) plaintiffs contend that FWS misapplied the factor under
17  16 U.S.C. 1533(a)(1) regarding the inadequacy of existing regulatory mechanisms by
18  erroneously claiming that existing regulations were inadequate; and (4) plaintiffs argue that
19  FWS' use of historical habitat loss in its analysis was improper because historical habitat loss is
20  "not a legally legitimate reason" for listing (Br. 6–16). Plaintiffs requested that the Court
21  vacate the rule during remand.

22  Defendants responded with a cross-motion for summary judgment. They claim that:
23  (1) FWS appropriately identified several threats to the species and its habitat such that the
24  listing of the Central California tiger salamander as threatened was warranted; (2) FWS
25  properly considered past destruction of habitat; (3) FWS used the best scientific and commercial
26  data available; and (4) FWS properly determined that existing regulatory mechanisms were
27  inadequate to protect the salamander. Defendants request that the listing be left in place

4

if remand were even applicable in the first place (Def. Br. 6–15). Defendant-intervenor adopts and supplements defendants' arguments.

Unless indicated otherwise, all further references to salamanders in this order refer to the Central California tiger salamander and all further references to listing refer to their "threatened" listing.

**ANALYSIS**

**1.  STANDING.**

As a threshold issue, this order addresses whether plaintiffs have standing, which defendant-intervenor contests. Standing is established if the plaintiff shows "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180–81 (2000).

The Court finds that plaintiffs have established standing. There are declarations based on the personal knowledge of officers from the Home Builders Association of Northern California, the Building Industry Legal Defense Foundation, and the California Building Industry Association. The members of these associations would otherwise have standing to sue in their own right. The ability of owners and developers to use their land "has been or will be constrained by the listing of the Central California population of the California tiger salamander" (Campos Decl. at 1). Members are injured by "reduced property values, delays or denials in loan approvals, delays or denials in permit approvals, and increased regulatory burdens" (*ibid.*). These interests are germane to the organizations' purpose as the organizations include members of the construction industry, owners and developers of land, and other professionals engaged in developing land (Campos Decl. at 1, Henderson Decl. at 1,

5

Cammarota Decl. at 1). This claim does not require the participation of all of these individual members in the lawsuit.

### 2. LEGAL STANDARD FOR REVIEWING ADMINISTRATIVE ACTION IN MOTION FOR SUMMARY JUDGMENT.

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). When reviewing an administrative action, "there are no disputed facts that the district court must resolve." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ibid.* "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Id.* at 770.

### 3. DID THE THREATENED LISTING OF THE CENTRAL CALIFORNIA SALAMANDER VIOLATE THE ESA?

Plaintiffs challenged the FWS's agency action under 16 U.S.C. 1540 (g)(1)(A), the citizen-suit provision of the ESA. Although the ESA provides for a right of action, it does not provide a standard of review. Rather, the Administrative Procedure Act's standard of review under 5 U.S.C. 706(2)(A) applies. *See Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1190 (9th Cir. 1988) ("Because ESA contains no internal standard of review, our review is governed by the Administrative Procedure Act").

The APA provides that agency actions may be set aside if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A). The relevant inquiry is whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Ctr. For Biological Diversity v. Badgley*, 335 F.3d 1097, 1100 (9th Cir. 2003).

"The court is not empowered to substitute its judgment for that of the agency. As long as the agency decision was based on a consideration of relevant factors and there is no clear

6

1   error of judgment, the reviewing court may not overturn the agency's action as arbitrary and
2   capricious. The basis for the decision, however, must come from the agency. The reviewing
3   court may not substitute reasons for agency action that are not in the record." *Arizona Cattle*
4   *Growers' Ass'n v. United States Fish and Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001)
5   (internal citations omitted). The Ninth Circuit is "deferential to the agency's expertise in
6   situations . . . where resolution of this dispute involves primarily issues of fact." *Ibid.* (internal
7   citations omitted).

### A. Has FWS Articulated a Standard for Ascertaining the Salamander's Threatened Status?

Plaintiffs argue that FWS failed to articulate a rational connection between the facts found and the conclusion drawn, thereby rendering the salamander "threatened" listing illegal. Plaintiffs rely on the improved salamander status from the May 2003 proposed rule's assessment to the August 2004 final rule's assessment. The final rule identified more salamander sites, a larger estimated occupied range, a decrease in threats attributable to urban development, a decrease in threats attributable to agricultural conversion, and an increase in the amount of protected habitat (69 Fed. Reg. at 47,229–33). Aside from evidence of historical habitat loss, which plaintiffs argued could not be a legitimate factor, there was little to support the current listing.

This order finds the listing was not rendered arbitrary and capricious just because threat estimates decreased. Defendants and defendant-intervenor do not dispute the decrease in threat estimates between the proposed rule and final rule. But other facts supported the listing. FWS's seven-member team, which consisted of six scientists and one representative from the Interior Solicitor's office, reviewed data pertaining to the listing of the salamander (Intervenor-Def. Selected Appendix at 11800). Five of the six scientists ranked the likelihood that "threatened" was the appropriate listing for the salamander as "high" while one scientist ranked the likelihood as "very high" (*id.* 11829). The FWS also solicited peer review from twenty-eight scientists, eleven of whom responded. "Based on our analysis, all 11 peer reviewers supported the listing of the Central California tiger salamander as threatened" (*id.* at 12589).

7

From Geographic Information System ("GIS") data and other records, FWS estimated that there were about 936,204 acres of upland and aquatic habitat for the Central California tiger salamander. It then found that 70,489 acres of salamander habitat fell within areas intended for high-to-medium-intensity development, and 59,897 acres fell within low-density development areas (69 Fed. Reg. at 47,230). Furthermore, "[FWS's] estimate of the location and amount of habitat threatened by conversion and fragmentation from urban uses described above does not consider all of the projected human population growth, urbanization, and subsequent habitat loss that will occur in the counties inhabited by the Central California tiger salamander because most city and county general plans have variable planning horizons that do not extend beyond 20 years" (*ibid*). In its conclusion, FWS predicted that, "at a continued 1.5 percent annual loss (the rate of loss during the 1980s and 1990s), [it] is projected to reach 88 percent by 2043"(*id.* at 47,240).

FWS delineated other threats salamanders faced, such as threats from "non-native predators . . . agricultural and landscaping contaminants, rodent control, roads, and hybridization" (*id.* at 47,231). Although plaintiffs discount the effects of hybridization and predation, the agency based its conclusions on the facts found. Professor H. Bradley Shaffer wrote in his response to the proposed rule for the California tiger salamander that "[a]lthough this threat [of genetic biopollution] is correctly identified in the proposed rule, I want to emphasize the enormity of this risk in the Central Coast range and Bay area regions of the Central California DPS. We have now found introduced genes from southern Santa Clara county throughout most of Monterey county down to Ft. Hunter Leggett on the San Luis Obispo county line, and east across all of San Benito county where CTS [California Tiger Salamanders] are known. At Ft. Hunter Leggett, every population is either introduced or a hybrid mixture. In Monterey county, virtually all populations are mixed. Ponds along the San Andreas fault and east into San Benito county are all hybrid mixtures . . . Based on our continual discovery of new sites, we feel that probably the entire area encompassed by the dots on this map is now heavily polluted with introduced genes. It is a major threat to the integrity of the species"

8

(Intervenor-Def. Selected Appendix at 2351–52). Contrary to what plaintiffs claim, hybridization poses a serious threat to Central California tiger salamanders.

This order also finds that FWS articulated a standard for listing, which was the five-factor threats analysis provided by 16 U.S.C. 1533. FWS examined (1) the present or threatened destruction, modification, or curtailment of the salamander's habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting the salamander's continued existence (*id.* at 47,229–40). Under the first factor, FWS found that "fragmentation of the remaining habitat is expected to continue in the foreseeable future as an effect of the rapidly growing human population in these counties within range of the California tiger salamander" (*id.* at 47,233). FWS found no threat to the species under the second factor (*ibid.*). With respect to the third factor, FWS found that the salamanders were in danger of predation by non-native species (*e.g.,* bullfrogs, western mosquitofish, largemouth bass, sunfish, bluegill, catfish, and fathead minnows) (*id.* at 47,233–34). Regarding the fourth factor, the final rule concluded that federal, state, and local laws were "insufficient to prevent past and ongoing losses of the limited habitat of the Central California tiger salamander, and [were] unlikely to prevent further declines of the species (*id.* at 47,234). Finally, FWS listed various natural or manmade factors affecting the continued existence of the salamanders, including exposure to various contaminants, rodent population control efforts, mosquito control, direct mortality while crossing roads, species' hybridization with non-native tiger salamanders and future hybridization, and practices associated with livestock grazing (*id.* at 47,237–40).

Plaintiffs argue that "[FWS] cannot reasonably say that a species merits listing simply by identifying a known risk factor without explaining why the risks associated with that factor will lead to foreseeable extinction" (Pls. Opp. at 3). In essence, plaintiffs claim that FWS has failed to explain why any of the identified threats are severe enough to merit the listing (*id.* at 5). Plaintiffs misstate the legal standard, which is not whether the risks will "lead to foreseeable extinction." For a species to warrant the "threatened" listing, it must be "likely to become an

9

1  endangered species within the foreseeable future throughout all or a significant portion of its
2  range." 16 U.S.C. 1532(20).  As discussed earlier, there is sufficient evidence in the
3  administrative record to warrant the decision; habitat loss and development risks contribute to
4  making salamanders an endangered species within the foreseeable future.  The agency also
5  applied the proper five-factor standard when analyzing the situation.  Giving proper deference
6  to the agency's findings, this order finds in favor of defendants and defendant-intervernor
7  because there was a rational connection between the facts and the conclusion drawn.

**B.     Has FWS Used the Best Available Scientific Data?**

The ESA requires the agency to make its determinations "solely on the basis of the best scientific and commercial data available" to the agency.  16 U.S.C. 1533.  "The best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'  Essentially, FWS 'cannot ignore available biological information.'" *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080–81 (9th Cir. 2006).  Now plaintiffs allege that FWS failed to rely upon the best data available when it entirely discounted a population study, which plaintiffs state that, "even if somewhat inaccurate, nevertheless reveals a salamander population substantially well off" (Pls. Br. at 9). LSA Associates conducted the population study.  FWS did not rely on the LSA study and conducted its own analysis based on the California Natural Diversity Database and other records to estimate known salamander habitat.  To plaintiffs, the decision to not consider the LSA study was both arbitrary and capricious.

The LSA study, conducted by Loredo and Van Vuren, estimated there to be about 840,000 individual California tiger salamanders in the Central California range (Intervenor-Def. Selected Appendix at 4431).  Plaintiffs claim that the LSA study constituted the best available scientific data on the salamander's current numbers.  The study acknowledged four assumptions underlying its results, one of which was that the pond was not a closed system; "approximately 20% of the salamanders produced in one pond may breed in a different pond" (*id.* at 4432–33).

FWS determined that the data was "speculative and not properly derived" for various reasons.  *First*, the breeding pond being researched was not a closed system, which allowed

10

1  salamanders to migrate into and out of the population being investigated at unknown rates.
2  *Second*, some salamanders may have lost their marks due to regeneration of clipped toes.
3  *Third*, California tiger salamanders marked in the first season may not have had an equal
4  opportunity to be recaptured during the following two seasons because they may not mature
5  until four or five years later.  *Fourth*, the range-wide estimate for this salamander was
6  speculative because "it extrapolates a population estimate derived from a single site to all sites
7  throughout the range of a species that displays different environmental conditions and
8  population sizes associated with such conditions" (69 Fed. Reg. 42,221).  Plaintiffs claim that
9  none of these objections are sufficiently substantial to discount the LSA study because "then the
10 resulting population estimate is simply overstated, not entirely invalid" (Br. at 11).

11      The Court disagrees.  On the one hand, plaintiffs argue that FWS should have taken at
12 least some part of the LSA study into account, even though the "resulting population estimate"
13 was potentially "overstated" or "pro tanto excessive."  On the other hand, plaintiffs focus on the
14 importance of having numerical data.  "Population studies are important in light of the strong
15 judicial preference for numerically based incidental take statements and permits, as opposed to
16 habitat or other proxies" (Br. at 12). So, plaintiffs argue, although the numerical data in the
17 LSA study was flawed in numerous ways, FWS should have given it more weight when making
18 its listing decision.  Plaintiffs cannot have it both ways.  If FWS were to base its listing decision
19 on numerical data, the data ought to be free of substantial flaws.  And contrary to plaintiffs,
20 the flaws *are* substantial.  For example, the Court has trouble understanding, as did the agency,
21 how there could be a reliable population estimate derived from a breeding pond if salamanders
22 could have migrated to and from four other nearby ponds.

23      Even though Congress has a preference for numerical data, it is not always required.
24 *See Arizona Cattle Growers' Ass'n*, 273 F.3d at 1249 ("We have never held that a numerical
25 limit is required").  Rather, "[i]n the absence of a specific numerical value . . . the Fish and
26 Wildlife Service must establish that no such numerical value could be practically obtained."
27 *Id.* at 1250.  In response to the LSA study estimates, the FWS stated, "Based on a review of the
28 scientific and commercial data, the total number of individual California tiger salamanders is

11

not known. The difficulty of estimating the total number of California tiger salamanders has been documented by a number of biologists. Estimates, however, have been made for specific locations in Monterey and Alameda counties. The fact that this species spends much of its life underground, only a portion of the total number of animals migrate to pools to breed each year, animals do not always breed in their natal pool or pond, and the California tiger salamander's wide distribution, make estimating the total number of California tiger salamanders difficult" (69 Fed. Reg. 47,220).

This order finds that FWS did properly consider the LSA study in the final rule, which gave reasons for deeming the study too speculative. The parties do not disagree that the LSA study was flawed; they disagree over the extent to which the flaws justify discounting it. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). Here, FWS did not ignore the available biological information; it found that the methodology of the LSA study was flawed to the point of not being reliable, and the agency backed up its conclusion with a reasoned evaluation of the LSA study and its own estimates. The Court therefore rejects plaintiffs' argument that FWS acted arbitrarily and capriciously when it discounted the results of the LSA study as not being the best available scientific data.

### C. Has FWS Misinterpreted and Misapplied the Listing Factor Regarding the Adequacy of Existing Regulatory Systems?

One of the five factors FWS should consider when determining a species' listing is the "inadequacy of existing regulatory mechanisms." 15 U.S.C. 1533. Plaintiffs argue that the salamanders already enjoyed many state and federal regulatory protections, even without an ESA listing. Defendants and defendant-intervenor claim otherwise. Relevant provisions include: (1) the federal Clean Water Act, 33 U.S.C. 1251, *et seq.*, (2) the ESA itself, (3) the California Streambed Alteration Act ("CSAA"), Cal. Fish & Game Code 1600, *et. seq.*, (4) the California Environmental Quality Act ("CEQA"), Cal. Publ. Res. Code 21000–21177, and (5) the California Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Cal. Water Code 13000, *et seq*.

12

1   Plaintiffs first claim that FWS misinterpreted the standard set forth in 15 U.S.C. 1533.
2 Rather than ascertain whether existing regulatory systems were "adequate," FWS applied a
3 more stringent standard, such as whether or not the regulatory systems were "complete."
4 *See, e.g.,* 69 Fed. Reg. 47,235 ("We conclude that regulation of wetlands filling by the Corps
5 under Section 404 of the CWA is inadequate to *completely protect* the Central California tiger
6 salamander from further decline") (emphasis added); *ibid.* ("Although some regulatory
7 protections may be afforded to the Central California tiger salamander from the California
8 red-legged frog, these protections do not *fully protect* the salamander because geographic
9 overlap between the two species is limited") (emphasis added).

10   Plaintiffs then claim that existing regulatory systems for the salamander are adequate.
11 Under the five aforementioned tests, many development projects that will occur within the
12 salamander's range are required to avoid about one-third to one-half of potentially affected
13 upland habitant and mitigate the environmental impact (AR at 4,438).  Projects must mitigate
14 impact, typically at a ration of 1:1 or higher, in wetlands within the jurisdiction of the CWA (*id.*
15 at 4,440).  The salamander is a species of special concern, which receive particular attention
16 under CEQA (*id.* at 4,441).  The Porter-Cologne Act provides mechanisms to maintain the
17 aquatic environment to support rare and endangered species (*id.* at 4,442).

18   In its final rule, FWS directly addressed these different regulatory mechanisms and
19 concluded that they were "insufficient to prevent past and ongoing losses of the limited habitat
20 of the Central California tiger salamander, and are unlikely to prevent further declines of the
21 species" (69 Fed. Reg. 47,234).  It based its conclusion on various factors.  The final rule
22 explained how the CWA provided inadequate protection because the Army Corps of Engineers
23 only denied "less than one-percent of all applications to discharge dredged or fill materials into
24 waters or wetlands on an annual basis.  While many applicants are required to provide
25 compensation for wetlands losses (*i.e.,* no net loss), many smaller impact projects remain
26 largely unmitigated unless specifically required by other environmental laws such as the
27 Endangered Species Act" (*ibid.*).  In addition, Section 404 of the CWA did not reach to isolate
28 wetlands or regulate the continuing losses of the terrestrial habitat (*id.* at 47,235).  With respect

13

1  to the ESA, there were few protections for upland habitat, where the salamanders spent about
2  eighty percent of their lives. Only eight percent lived in areas designated as critical habitat for
3  vernal-pool species. The ESA protection for the red-legged frogs and San Joaquin kit fox did
4  not sufficiently protect salamanders because their habitats did not completely overlap
5  (*id.* at 47,235–36). FWS then examined three approved habitat-conservation plans that covered
6  the California tiger salamander. It concluded that the plans were of limited use because they did
7  not cover some activities, like agricultural activities (*id.* at 47,236). Turning its analysis to
8  California law, FWS found that CEQA and other state statutes did not serve "as an effective
9  regulatory mechanism for reducing or eliminating several of the other manmade factors . . .
10 which may also adversely affect California tiger salamanders and their habitat" (*ibid.*).
11 FWS believed that "Porter-Cologne has the same shortcomings as the Clean Water Act as a
12 regulatory mechanism that effectively protect California tiger salamander, that is, it provides
13 State authority to regulate, and therefore protect, when deemed appropriate, wetlands, but does
14 not provide authority to substantially regulate surrounding uplands that also may be essential to
15 wetland dependent organisms such as the California tiger salamander" (*id.* at 47,237). As far as
16 the agency could tell, it was "not aware of any specific county or city ordinances or regulations
17 that provide direct protection for the California tiger salamander" (*ibid.*). When asked what was
18 the reduction in threat to the Central California DPS due to existing regulatory mechanisms,
19 the responses were: two biologists ranked the reduction in threat as "very low," two biologists
20 ranked it "low," one biologist ranked it "low-medium," and one biologist ranked it "medium"
21 (Intervenor-Def. Selected Appendix at 11820–21).
22      This order finds that FWS did not improperly change the standard in determining the
23 adequacy of existing regulatory mechanisms. Just because the final rule occasionally
24 mentioned "complete" or "fully" in its analysis did not mean that FWS had applied a more
25 stringent standard. Read as a whole, the final rule pointed out all the inadequacies of existing
26 regulations on the federal, state, and local levels. There was also some evidence from FWS
27 biologists indicating that these mechanisms had a very low to medium effect on threat
28 reduction. This order finds that FWS did consider the relevant factors such that there was a

14

rational connection between the facts found (where federal and state laws failed to protect salamanders) and the conclusion drawn (inadequacy of regulatory systems).

### D. Has FWS Improperly Based Its Listing Decision On Historic Habitat Data?

The final objection plaintiffs have to the threatened listing is that FWS improperly relied upon a habitat proxy, thereby violating the statutory requirement to use the best available scientific data. Plaintiffs claim that the agency heavily relied upon past habitat loss, particularly the estimated seventy-five percent loss calculated by Shaffer (1993) and Shaffer *et al.* (1993). According to 16 U.S.C. 1533, however, the agency should analyze "the present or threatened destruction, modification, or curtailment of [the species'] habitat or range." In other words, rather than base the listing on past habitat loss, FWS should have looked into current and future habitat status.

The Court finds plaintiffs' argument has no merit. *First*, FWS did not base its listing solely on historical habitat loss. It conducted a GIS analysis of salamander habitat based on 711 known occurrences of the species (*i.e.,* 632 from the California Natural Diversity Database and 79 from additional sources). FWS also examined "habitat projected to be lost in the future to urban development and low-density development; other future development; and our estimate of the amount of habitat that is afforded some protection" (69 Fed. Reg. 47,230). It concluded that eight percent of salamander habitat was threatened by high-density residential, medium-density residential, industrial, and commercial development. Six percent of salamander habitat was threatened by low-density residential development (*ibid.*). The projection did not include the loss of salamander habitat caused by conversion of habitats to intensive agriculture because of the difficulty in estimations. "[C]onversion to intensive agriculture largely depends upon the individual landowner and is based on numerous factors that are difficult to predict, such as economic considerations, markets, and water availability" (*id.* at 47,230–31).

*Second*, the Court has to plaintiffs' argument is that FWS used the historical data to predict *future* habitat loss. "In summary, a primary cause of the decline of the California tiger salamander is the loss of habitat due to conversion for residential, commercial, and agricultural

15

activities. In addition to direct loss of habitat, the widespread conversion of land to residential and agricultural uses has led to the fragmentation of habitat throughout the range of the Central California tiger salamander, and isolation of the remaining population. This fragmentation of the remaining habitat *is expected to continue in the foreseeable future* as an effect of the rapidly growing human population in these counties within range of the California tiger salamander" (*id.* at 47,232–33) (emphasis added).

Moreover, the Ninth Circuit has recognized historic habitat loss to be an appropriate (if not sole) consideration in listing decisions. *See, e.g., National Ass'n of Home Builders v. Norton*, 340 F.3d 835, 848–49 (9th Cir. 2003) (holding that historical range of taxon would be reduced, so as to support designation of a portion of the species as distinct DPS, for listing purposes under the ESA if there were major geographical areas in which the species was no longer viable but once was). The Court finds that FWS did not act arbitrarily or capriciously in considering historical habitat loss — among other factors — during its listing decision.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** plaintiffs' motion for summary judgment and **GRANTS** defendants' cross-motion for summary judgment. The final rule is undisturbed.

**IT IS SO ORDERED.**

Dated: October 22, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE